UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| PROJECT PRODUCERS, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>KIM LAMONT OWENS,<br><br>    Defendant. | Case No. 23-10056<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [47]**

As the music world well knows, "breaking up is hard to do." Neil Sedaka, *Oh Carol* (1970).

In May 2003, Kim Lamont Owens, a Grammy-nominated recording artist, and Project Producers, LLC, entered into a written management agreement. In April 2005, Owens sent a written notice of termination to Toya Hankins, the sole member of Project Producers. Hankins says Owens immediately rescinded the termination, and the parties continued working together under the terms of their contract for about nine years. Then, in 2014, Hankins says that Owens breached the contract by reducing her commission and violating the contract's exclusivity provision. He then attempted to terminate the contract verbally in October 2016. But Hankins argues this was ineffective because it was not in writing, as required under the contract. And thus she says that Owens has been in violation of the parties' original 2003 written agreement from October 2014 until the present.

Owens sings a different tune. He disputes that he ever rescinded the April 2005 written termination of the contract. Instead, he says the parties continued to work together for over a decade under a different, oral contract until he verbally terminated that contract in October of 2016. And, because that oral contract contained different provisions regarding commissions and exclusivity, he was never in breach, nor does he owe Hankins any post-term commissions.

On October 17, 2022, nearly six years after the end of the parties' working relationship, Project Producers sued Owens for breach of contract, unjust enrichment, quantum meruit, promissory estoppel, breach of oral contract, and an accounting. (ECF No. 1, PageID.16–19.) In response, Owens moved to dismiss, arguing, among other things, that Project Producers' breach of contract claims were time-barred. (ECF No. 5, PageID.55.) The Court granted Owens' motion in part, dismissing Project Producers' claims for unjust enrichment, quantum meruit, promissory estoppel, and accounting. (ECF No. 12, PageID.200.) As for the breach of contract claims, the Court found that "Project Producers' complaint, filed on October 17, 2022, [was] timely only with respect to breaches that occurred within the six years that preceded the date of filing, that is, breaches that occurred as early as October 16, 2016." (*Id.* at PageID.192.)

Now before the Court, following an extensive period of discovery, is Owens' motion for partial summary judgment. (ECF No. 47.) He asks the Court to find that "there is no genuine issue of fact that the parties' managerial relationship terminated on October 14, 2016." (ECF No. 47, PageID.1340.) And thus, Owens says, "it is

2

indisputable that the 2003 [a]greement terminated no later than May 30, 2017, and [Project Producers'] entitlement to post-term commissions thereunder ended, at the absolute latest, on May 30, 2019." (*Id.* at PageID.1340.)[1] The motion is fully briefed (ECF Nos. 51, 52) and does not require further argument. *See* E.D. Mich. LR 7.1(f). After careful consideration of this briefing and the record, the Court will GRANT Owens' motion for partial summary judgment.

I.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" if the evidence permits a reasonable fact-finder to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *See Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021).

The Court views the facts in the light most favorable to the nonmovant—here, Project Producers. *See Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023). This

---

[1] As will be explained, the 2003 written agreement was entered into on May 31, 2003. It would automatically renew at the end of the year unless properly terminated. Thus, if the October 2016 notice was proper termination, the contract would end, i.e., it would not automatically renew, as of May 30, 2017. The agreement further provided for the payment of commissions for two years after termination.

3

party, though, "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quoting Fed. R. Civ. P. 56(e)).

## II.

Project Producers, LLC, is a Michigan limited liability company, managed by Toya Hankins. (ECF No. 1-1, PageID.11–12.) Kim Lamont Owens is a four-time Grammy-nominated international recording artist. (*Id.*) On May 31, 2003, Hankins, through Project Producers, entered into a written management contract with Owens to act as Owens' exclusive personal manger and consultant in exchange for a 20% commission on his gross earnings. (ECF No. 47-3, PageID.1382.) The agreement provides that it shall continue for an "initial term" of two years from the date of execution and "shall be renewed for one (1) year periods (hereinafter 'renewal period(s)') automatically unless either party shall give written notice of termination to the other not later than thirty (30) days prior to the expiration of the initial term or the then current renewal period." (*Id.* at PageID.1381.) The agreement also contains a "sunset provision" stating that, in the event of termination, Project Producers was to be paid two years of post-term commissions, at a reduced rate of 10% for year one and 7% for year two. (*Id.* at PageID.1383.) Lastly, the contract states that it cannot "be changed or modified, or any covenant or provision hereof waived, except by an agreement in writing signed by the party against whom enforcement of the change, modification or waiver is sought." (*Id.* at PageID.1388.)

On April 29, 2005, 30 days before the end of the initial two-year term of the contract, Owens' attorney sent a letter to Hankins:

4

> As you know, the term of the Agreement will expire on May 30, 2005. Paragraph "1" of the Agreement provides that the term of the Agreement will be automatically renewed unless either party shall give written notice to the other of termination not later than thirty (30) days prior to the expiration of the initial term.
>
> This letter shall serve as notice to you that [Owens] does not intend to renew the agreement upon the terms and conditions set forth therein. However, he would like to commence negotiations in hopes that you and he can agree on terms and conditions for a new agreement.

(ECF No. 47-4, PageID.1390.) Project Producers acknowledges that this letter constituted notice of intent to terminate the agreement but says that "an immediate discussion ensued in which [Owens] withdrew and rescinded his termination of the management agreement, and the written agreement was revived and honored." (ECF No. 1-1, PageID.14.) Hankins testified that following receipt of the letter she called Owens. (ECF No. 47-17, PageID.1511.) During that hour-long call, Hankins says that she explained the "structure" of their relationship to Owens and answered his questions. (*Id.* at PageID.1512–1520.) "Once he had [an] understanding," says Hankins, Owens told her to reach out to his lawyer to "[t]urn [the agreement] back on and we can continue." (*Id.* at PageID.1512.) Hankins concedes that there is nothing in writing memorializing this conversation. (*Id.* at PageID.1521.)

Owens disputes that he ever rescinded his termination of the written agreement. He admits "that [the] management relationship continued," but insists that "the 2003 agreement was terminated." (ECF No. 51-1, PageID.1935 ("Q. But in 2005 you continued your relationship of the contract with her as your manager? A. I'm sorry. The contract was terminated. In 2003, my contract with Toya Hankins . . . was terminated according to the specifications that were required in the

5

contract. . . . Q. And after 2005 you rekindled that contract? A. No, I did not rekindle.").)

In any event, both parties agree that following the April 2005 phone call, the parties continued to have a working relationship. But a few key elements of that relationship changed. Relevant here, in January of 2014, Hankins' commission for publishing revenue changed from 20% to 15%. (ECF No. 47-17, PageID.1526; ECF No. 47-1, PageID.1374.) Hankins claims that change "was not agreeable" and that the reduction "was forced upon [her]." (ECF No. 47-17, PageID.1526; *see id.* at PageID.1487–1488.) She also says that in 2014, Owens began to "withhold payments" that were owed to her and that she "refuse[d] the forced adjustment for 11 months before her mother's health condition compelled her to accept the new terms." (ECF No. 1-1, PageID.14.)

Many years after the April 2005 phone call, the parties also discussed entering into another written management agreement. For instance, various emails between the parties and their counsel demonstrate that in late 2014, the parties were attempting to negotiate a new arrangement. On August 7, Owens' counsel emailed Hankins advising that, "[p]er our conversation, I spoke with [Owens] and he is ok with entering into negotiations for a management agreement with Project Producers." (ECF No. 47-22, PageID.1792.) A couple of months later, on October 17, Hankins' counsel emailed Hankins informing her that they had "spoke[n] to [Owens' attorney] yesterday and agreed to put together a term sheet on which we are proposing to enter into the new management agreement." (ECF No. 47-23,

6

PageID.1797.) Hankins acknowledges that the parties did indeed attempt to negotiate a new written agreement. (ECF No. 47-17, PageID.1533–1534 ("Q. Did Project Producers ever try to negotiate another written management agreement with Mr. Owens after 2005? A. Did we ever try to negotiate another written agreement. Yes.").) But no new written agreement was ever executed. (*See id.* at PageID.1563–1564; *see also* ECF No. 47-1, PageID.1375 ("At various times from May 30, 2025[,] through October 2016 Hankins and I discussed the possibility of entering into or negotiating a new written management agreement, but never did so.").)

In September 2015, Owens sent an email addressed to both Hankins and a person named "Damien" stating:

> Wondering if you've had an opportunity to connect.
>
> I'm excited about the prospect of having an All Star Management Team in place to assist me in navigating the next phase of my career.
>
> You each bring specific skill sets, expertise and relationships to the table that I believe will be crucial to maintaining and building upon the success I've enjoyed over the last 15 years.
>
> My hope is to make sure everyone is comfortable and have a formal agreement in place within the next couple of weeks.

(ECF No. 51-2, PageID.1998.)

According to Hankins, Owens had not consulted her before proposing that she and Damien act as comanagers. (ECF No. 47-17, PageID.1569.) And by making such a proposal, says Hankins, Owens violated the exclusivity clause of the parties' 2003 agreement. (*See* ECF No. 47-3, PageID.1381 ("Manager is hereby engaged as Artist's

7

sole and exclusive personal manager and advisor throughout the world.").) [2] Further, in 2015, Hankins says Owens entered into a publishing agreement with Universal Music Publishing and Kobalt Music without Hankins' knowledge or involvement. (ECF No. 47-17, PageID.1598.) Hankins also alleges that Owens collaborated with another artist for a recording project without Hankins' knowledge and failed to compensate her for her share of any royalites he received in connection with that project. (*Id*. at PageID.1602–1603.)

Owens, however, acknowledges that "there remains a genuine issue of fact as to whether Owens terminated the parties' written management agreement in 2005." (ECF No. 47, PageID.1348.) Thus, his motion for partial summary judgment mostly centers around what happened on and after October 14, 2016. That day, Owens says that he met with Hankins and informed her she would no longer be his manager—he was ending their relationship. (ECF No. 47-1, PageID.1375.) Hankins admits that the pair met up at a FedEx Kinko's for about an hour, where Owens "attempted to terminate the [contract] orally." (ECF No. 51, PageID.1856.) Following the conversation, Hankins claims she "wasn't certain" if she was still his manager. (ECF No. 47-17, PageID.1580.) Instead, she says, Owens told her that "[his counsel] would notify [her] to . . . further discuss in detail the nature of the conversation that [they]

---

[2] For clarity, as the Court previously found, "Project Producers' claim that Owens breached the contract by . . . violating the contract's exclusivity provision in 2015" is barred by Michigan's six-year statute of limitations period. (ECF No. 12, PageID.197.) But Project Producers' claims that Owens continued to violate the exclusivity provision from October 16, 2016, onward are not time-barred.

8

had that day"—so she claims she was unsure if their working relationship was over for good. (*Id.*)

Less than a month later, on November 9, 2016, Owens' counsel sent Hankins' counsel an email containing a draft settlement agreement. (ECF No. 47-6, PageID.1415.) Hankins' counsel responded that the proposed settlement agreement was not sufficient, and that "[e]ven the now expired Exclusive Management Agreement"—that is, the parties' original 2003 written contract— "contained a sunset provision. [Hankins] expected your settlement offer to contain all of the commissionable income payable to her along with some form of customary post term commission." (ECF No. 47-7, PageID.1413.) She included a counteroffer, seeking a ten-year sunset provision, but agreeing that the "termination date" of the parties' relationship was October 14, 2016. (*Id.*)

Around a month later, on December 5, 2016, Owens' counsel sent Hankins' counsel a letter formally responding to her counter. (ECF No. 47-8.) In the letter, Owens' counsel expressed his view that the parties' original 2003 management agreement "expired some time ago," that "[f]ollowing the expiration of the [agreement] in 2005, different terms and conditions were agreed to relating to Project Producers' commission structure," and that "[a]t no time did [Owens] agree that the 'Sunset Clause' contained in the expired Management Agreement would be viable or in force and effect years after the [agreement] expired." (*Id.* at PageID.1417.) The letter also reiterated Owens' "position" that whatever "management relationship" the parties may have had was terminated no later than October 14, 2016. (*Id.* at

9

PageID.1417–1418.) Ultimately, attempts at resolution were unsuccessful and the parties never entered into any settlement agreement.

From 2015 to 2017, the parties, through their lawyers, continued to dispute whether Owens owed any money to Hankins based on the sunset provision in the original 2003 written agreement. (*See, e.g.*, ECF No. 47-11, PageID.1428.) And "[o]n or about February 24, 2017, and August 15, 2017," Owens made "commission payments to [Hankins] with respect to monies earned by [her] prior to October 14, 2016." (ECF No. 47, PageID.1359; *see* ECF No. 47-10, PageID.1424.)

In October 2022, Project Producers filed this lawsuit claiming, among other things, that Owens had been in breach of the 2003 agreement for several years, and seeking compensation for unpaid wages and post-term commissions. (ECF No. 1.) The case was narrowed through an early motion to dismiss and then the parties extensively developed the record during discovery.

That brings us to Owens' motion for partial summary judgment. (ECF No. 47.) In it, Owens makes a fairly narrow argument: even assuming the original 2003 written agreement between the parties was still in effect following his 2005 termination letter (a premise Owens still emphatically disputes), the parties' relationship ended no later than October 14, 2016. He says that the parties, through their conduct, mutually agreed to waive the contractual requirements that modifications and termination be made in writing, such that his oral termination of the agreement at the FedEx store in October of 2016 was valid, and the parties' contract ended no later than May 30, 2017—i.e., the day before it was due to annually

10

renew. Thus, argues Owens, assuming the 2003 agreement was still in effect, the two-year sunset provision of that contract means that Hankins' "entitlement to post-term commissions" would have "ended, at the absolute latest, on May 30, 2019." (*Id.* at PageID.1340.) Put differently, Owens merely asks this Court to narrow the scope of the parties' dispute and find that—regardless of what happened in 2005—the parties' relationship must have ended when he verbally told Hankins their relationship was over in October of 2016.

Project Producers opposes the motion. (ECF No. 51.) It disputes that the parties' actions following the October 2016 conversation demonstrated a waiver of the written termination provision in the 2003 agreement. (*Id.* at PageID.1864–1870.) "[T]here is a genuine issue of material fact," it says, "regarding whether [Hankins'] actions amount to waiver," and "reasonable minds could differ on whether her actions were consistent with enforcing her rights under" the 2003 agreement. (*Id.* at PageID.1870.) The Court addresses these arguments below.

### III.

Because the 2003 agreement between the parties provides that it "shall be subject to and construed in accordance with the laws of . . . Michigan," the Court applies Michigan law. (ECF No. 6-2, PageID.105.) "[I]t is well established in [Michigan] law that contracts with written modification or anti-waiver clauses can be modified or waived notwithstanding their restrictive amendment clauses." *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 257 (Mich. 2003). That is so because "the parties possess, and never cease to possess, the freedom to

11

contract even after the original contract has been executed." *Id*. But "freedom to contract" does not mean that a party can "unilaterally alter an existing bilateral agreement." *Id*. (emphasis omitted). So when a contract contains an express provision—whether a substantive provision (like the written-notice-of-termination requirement at issue here) and/or a modification provision (for example specifying that parties can only modify or waive express contract terms via signed writing)— the "party alleging waiver or modification must establish a mutual intention of the parties to waive or modify" that provision. *Id*. at 258.

This "mutuality requirement is satisfied where a modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract." *Id*. Put differently, "when a course of conduct establishes by clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms, the requirement of mutual agreement has been satisfied." *Id*.; *see Sharma v. Ascension Health, Inc*., No. 303913, 2012 WL 2126038, at *1 (Mich. Ct. App. June 12, 2012) (per curiam) ("[I]f the parties subsequently disagree about whether a waiver occurred, the burden is on the party alleging the waiver to establish by clear and convincing evidence that both parties intended to waive the provision at issue."). Michigan courts address the issue of mutual modification on a case-by-case basis, considering whether the facts of a particular case warrant the conclusion that the parties mutually agreed to a contract

12

modification. *Trailer Bridge, Inc. v. Kmart Corp.*, No. 07-11963, 2008 WL 11355296, at *5 (E.D. Mich. June 30, 2008).

Owens first asserts that on several occasions *before* October 14, 2016, the parties agreed to modify material contract terms without making those modifications in writing. (ECF No. 47, PageID.1362–1363.) For example, Owens says that "the parties had previously modified a material term of the [a]greement (to the extent it had not already terminated) without a written modification in 2005 when they adjusted Plaintiff's commission rate for touring revenue from 20% net to 15% gross." (*Id.* at PageID.1362.) According to Owens, those earlier verbal modifications are evidence that the parties mutually agreed to again modify the contract without a writing in October of 2016 when he verbally terminated the agreement. (*Id.* at PageID.1363 (describing prior verbal modifications and asserting that the verbal termination "was therefore consistent with the parties' course of dealings").)

Hankins responds that the parties' prior unwritten modifications involved "mutual discussion" and eventually mutual assent, while her alleged termination by Owens did not. (ECF No. 51, PageID.1865.) But she does not dispute that the parties made verbal modifications to material contract terms over the years. Indeed, she says that "[w]hile the [2003 agreement] included an anti-waiver provision, the parties have modified the terms of the [agreement] with mutual assent, establishing a course of conduct the parties first would engage in mutual discussion to modify the contractual terms and then have a meeting of the minds as to that suggested modification." *(Id.*; *see also* ECF No. 47-17, PageID.1523 ("Q. Ms. Hankins, would you

13

agree that how a manager gets paid with respect to touring is an important part of a management agreement? A. Yes.").) And while Hankins may be right that past verbal modifications as to certain contract terms is not itself enough to show that the parties agreed to an unwritten modification or waiver of this specific term, Owens puts forth much more evidence of mutual modification.

Indeed, Owens also argues that Hankins' affirmative conduct *after* October 14, 2016, constitutes "clear and convincing evidence" that she mutually agreed to waive enforcement of the written termination notice requirement. (ECF No. 47, PageID.1362.) In the main, he shows that following their October 14, 2016, conversation, Hankins took certain affirmative steps that indicate she assented to the verbal termination of the parties' agreement.

First, the record supports that since the end of 2016, Owens has not spoken with Hankins, nor has she performed any managerial services for him. (*See* ECF No. 47-17, PageID.1532 ("Q. So from the end of 2016 to the present, have you spoken to [Owens]? A. No.").) Owens contends that this lack of communication indicates that their relationship was over. (ECF No. 47, PageID.1363.) He makes a fair point—it is hard to act as someone's manager if you stop speaking with them. But, as Hankins responds, "mere silence" does not amount to a waiver, even if the silent party had knowledge that the other party was not abiding by the parties' contract. (ECF No. 51, PageID.1867 (citing *Sharma*, 2012 WL 2126038, at *2)); *see Quality Prods.*, 666 N.W.2d at 258 ("[W]aiver is a voluntary and intentional abandonment of a known right."); *United Wholesale Mortg. v. Am.'s Moneyline, Inc.*, No. 22-10228, 2025 WL

14

1819015, at *7 (E.D. Mich. July 1, 2025) (collecting cases). So this lack of communication alone is not clear and convincing evidence that Hankins waived written termination notice.

But there is much more. Start with the several emails Hankins sent to others shortly after the parties' October 2016 conversation. On October 16—just two days after Owens says he verbally terminated the parties' contract—Hankins sent an email to Carla Glamb, a Project Producers "team member" who was "assisting [Hankins] in rendering services to Mr. Owens" (ECF No. 47-17, PageID.1592), stating: "Just wanted to let you know that [Owens] and I are no longer working together . . . We officially parted ways last Thursday" (ECF No. 47-24, PageID.1800 (ellipses in original)). Three days later, Hankins sent another email, this time in response to a request from Owens' booking agents, stating that she could not provide the information they were seeking because "[u]nfortunately effective last Thursday - I am no longer working with [Owens]. He decided to work with Justin Timberlake's Manager." (ECF No. 47-9, PageID.1420.) And a month later, in November 2016, Hankins responded to an email from Dean Handy, an "Accounts Payable Analyst," asking about Owens' availability by letting Handy know that she was "no longer representing [Owens]." (ECF No. 47-25, PageID.1803.) Owens also highlights that at this point Hankins had removed reference to Owens from her email signature. (*Id.*)

Additionally, in January 2017, Hankins reached out to other industry contacts to let them know she was no longer representing Owens (ECF No. 47-26, PageID.1805) and responded to requests to book Owens by letting individuals know

15

that she was no longer representing him (ECF No. 47-27, PageID.1810). In one of these emails, her signature reads, "Manager for: Motown Artist Kem [Owens] 1997–2016" (ECF No. 47-26, PageID.1805) and in another, she removes mention of Owens from her signature entirely (ECF No. 47-27, PageID.1811). Owens points to still more emails between October 2017 and September 2020 in which Hankins told third parties that she was no longer working with Owens. (ECF No. 47, PageID.1355; *see, e.g.*, ECF Nos. 47-14, 47-29.)

Now to social media. Owens also highlights that, after October 14, 2016, Hankins updated her Instagram, Twitter, and LinkedIn profiles to indicate she had stopped representing Owens in 2016. (ECF No. 47, PageID.1355–1356; *see* ECF No. 47-20, PageID.1788 (Instagram); ECF No. 47-21, PageID.1790 (Twitter); ECF No. 47-19, PageID.1783 (LinkedIn).)

Lastly, as already mentioned, there was substantial correspondence between counsel for Owens and Hankins to try to reach a settlement on post-termination commissions (ECF Nos. 47-6, 47-7), including the November 14, 2016, email with Hankins' settlement agreement counteroffer, which stated the contract termination date was October 14, 2016 (ECF No. 47-7, PageID.1413 ("Below is what we are seeking by way of the settlement: Termination Date: October 14, 2016[;] Commission: 15% for live performances and music publishing revenue / 20% all other revenue[;] Sunset: 10 years . . . .")).

"It is well settled that a course of affirmative conduct, particularly coupled with oral or written representations, can amount to waiver." *Quality Prods.*, 666 N.W.2d

at 261; *see Patel v. Patel*, 922 N.W.2d 647, 651 (Mich. Ct. App. 2018) (per curiam) ("[A] valid waiver may be shown by 'express declarations or by declarations that manifest the parties' intent and purpose,' or be an implied waiver, 'evidenced by a party's decisive, unequivocal conduct reasonably inferring the intent to waive.'" (citations omitted)); *Sweeney v. Visalus, Inc.*, No. 334509, 2017 WL 6502935, at *9 (Mich. Ct. App. Dec. 19, 2017) (per curiam) (finding waiver of written notice requirement based on course of conduct where contracting parties "acknowledged in writing their awareness that they had been terminated"). There were ample such representations here. The Court thus finds this undisputed evidence "so clear, direct, weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy," that Hankins and Owens mutually agreed to waive the written termination provision (and written modification provision) of the parties' 2003 agreement, such that Hankins accepted Owens' October 2016 oral termination. *In re Martin*, 538 N.W.2d 399, 410 (Mich. 1995) (explaining that evidence is clear and convincing when it "enables the factfinder to come to a clear conviction, without hesitancy" (citation modified)).

Resisting this conclusion, Hankins argues that Owens fails to meet his burden because he is merely relying on her "informal comments made to third parties," which "falls short of Michigan's clear standard for establishing waivers." (ECF No. 51, PageID.1867.) This argument fails to persuade. First, Hankins does not explain why this evidence falls short. She cites no case law to suggest the Court cannot rely on her own statements, formal or informal, when deciding whether she mutually assented

17

to the waiver of the written notice provisions. Second, describing the referenced communications as "informal comments made to third parties" is not a fair characterization of the record evidence.

To the contrary, Hankins' social media profiles informed the general public that her relationship with Owens had ended. She affirmatively advised industry partners and individuals seeking to work with Owens that she was no longer his manager. Ample record evidence demonstrates that when multiple individuals reached out to Hankins about working with Owens, she responded each time by informing them that she was no longer his manager. She also immediately reached out to other Project Producers' team members who were providing services to Owens to inform them that she was no longer working with him.

Finally, Hankins is right that her "lack of formal challenge" to Owens' 2016 oral termination is not alone enough to find waiver. (ECF No. 51, PageID.1867.) But again, Hankins' "mere knowing silence," *Quality Prods.*, 666 N.W.2d at 254, is not the basis for Owens' arguments or the Court's conclusion. The record contains much more. And the Court can certainly consider that, from 2016 to 2022, it does not appear Hankins contacted Owens to question or clarify the nature of their relationship or to ask how she should handle any of the repeated requests to work with him that made their way into her inbox. This evidence, *together with* the parties' history of verbally modifying the contract, Hankins ceasing managerial services to Owens after his verbal termination in October 2016, and her numerous email and social media communications announcing the end of her managerial role, convinces the Court by

18

clear and convincing evidence that the parties mutually waived the written termination and written modification provisions of their agreement. Thus, the Court will grant Owens' motion for partial summary judgment.

## IV.

It is worth clarifying what remains for trial: the parties' dispute over whether Owens rescinded his April 2005 termination of the 2003 written agreement.

If a jury finds that he did, then the parties' 2003 written agreement was in effect until Owens verbally terminated it on October 14, 2016. The contract's two-year sunset provision would allow Hankins to potentially recover damages suffered during the two years following the date of annual renewal, May 30, 2017. Thus, Hankins' window to potentially recover damages would span from October 16, 2016, through May 30, 2019.

If Owens did not rescind his written termination, however, and the parties were thereafter operating under some form of oral contract, a jury would be left to determine the nature of that agreement, whether Owens ever breached that agreement, and whether Hankins would be entitled to any post-term commissions pursuant to that agreement.

## V.

For the reasons above, the Court GRANTS Owens' motion for partial summary judgment (ECF No. 47).

SO ORDERED.

Dated: September 11, 2025

                                                  s/Laurie J. Michelson  
                                                  LAURIE J. MICHELSON  
                                                  UNITED STATES DISTRICT JUDGE